STAN S. MALLISON (SBN 184191)
    StanM@TheMMLawFirm.com
HECTOR R. MARTINEZ (SBN 206336)
    HectorM@TheMMLawFirm.com
DAN KELLER (SBN 332576)
    DKeller@TheMMLawFirm.com
MALLISON & MARTINEZ
1939 Harrison Street, Suite 730
Oakland, California 94612-3547
Telephone: (510) 832-9999
Facsimile: (510) 832-1101

Attorneys for Representative Plaintiff
And the Plaintiff Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIANO SAUCEDO, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>FLAGSTAR BANK, FSB, and TRANS UNION LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Violation of the California Consumer Privacy Act, Civil Code § 1798.150, *et seq.*<br>2. Violation of California Business & Professions Code § 17200, *et seq.*<br>3. Negligence<br>4. Breach of Contract<br>5. Breach of the Implied Covenant of Good Faith and Fair Dealing<br>6. Breach of the Implied Contract<br>7. Breach of Confidence<br>8. Breach of Fiduciary Duty<br>9. Unjust Enrichment<br>10. Violation of the Fair Credit Reporting Act<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Valeriano Saucedo ("Plaintiff"), individually, and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Flagstar Bank, FSB ("Defendant"), and Trans Union LLC ("TransUnion") as follows:

## I.   INTRODUCTION

1.      Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard personally identifiable information that Defendant stored on its network systems, including, without limitation, names, addresses, Social Security numbers, financial information (e.g. account numbers, credit or debit card numbers), and "other" types of information (collectively, "personally identifiable information" or "PII").[1] This is the second data breach of Defendant's information data base in less than 2 years, resulting in the exfiltration of consumer data, and therefore was entirely foreseeable.

2.      According to its website, Defendant has assets of $24.9 billion and is the seventh largest bank mortgage originator nationally."[2] Defendant "operate[s] 158 branches in Michigan, Indiana, California, Wisconsin, and Ohio and provide[s] a full complement of products and services for consumers and businesses."[3] Its "mortgage division operates nationally through 79 retail locations and a wholesale network of approximately 2,600 third-party mortgage originators."[4]

3.      Defendant's customers entrust Defendant with an extensive amount of their PII. Defendant retains this information on computer hardware—even after the customer relationship ends. Defendant asserts that it understands the importance of protecting such information.

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).
[2] https://www.flagstar.com/about-flagstar.html (last visited August 22, 2022).
[3] *Id.*
[4] *Id.*

4.      On or before June 2, 2022, Defendant discovered that an unauthorized actor "accessed and/or acquired" the information of more than 1,500,000 individuals from its network between December 3, 2021 and December 4, 2021 (the "Data Breach").[5]

5.      While Defendant discovered that information had been exfiltrated on or before June 2, 2022 after "an extensive forensic investigation and manual document review," Defendant has not revealed precisely when it learned of the Data Breach.[6]

6.      On or before June 17, 2022, Defendant reported that the types of affected information included, without limitation, names, addresses, Social Security numbers, financial information (e.g. account numbers, credit or debit card numbers), and "other" types of information.[7]

7.      This was Defendant's second major data breach in 2021. Indeed, on or before January 22, 2021, Defendant learned that an unauthorized actor breached Defendant's vendor's file sharing platform, which Defendant had used to store its current and previous customers' information.[8] Less than one year later, yet another unauthorized actor accessed and/or acquired PII collected, stored, and maintained by Defendant - despite Defendant's assertions that it was taking steps to secure the PII of its customers following its previous data security incident.

8.      By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties to those individuals.

9.      Defendant's internal systems contain millions of individuals' detailed and highly sensitive PII. Defendant admits that the Data Breach involved unauthorized access and activity on

---

[5] https://apps.web.maine.gov/online/aeviewer/ME/40/667f2112-b49f-445d-be03-dee38e32bf8e.shtml (last visited August 22, 2022).

[6] https://oag.ca.gov/system/files/Flagstar%20Standard%20Notification%20Letter%20%28CA%29%20-%2006-17-2022.pdf (last visited August 22, 2022)

[7] Rob Bonta, Attorney General of California, *Search Data Security Breaches*, (https://oag.ca.gov/privacy/databreach/list); *Submitted Breach Notification Sample*, (https://oag.ca.gov/ecrime/databreach/reports/sb24-554369) (last visited August 26, 2022); Ken Paxton, Attorney General of Texas, *Data Security Breach Reports*, Flagstar Bank, FSB (published June 20, 2022), https://oagtx.force.com/datasecuritybreachreport/apex/DataSecurityReportsPage.

[8] https://oag.ca.gov/system/files/Flagstar%20Bank%20Ad%20Standard%20r3prf.pdf (last visited August 22, 2022).

their internal systems and that the names, or other personal identifiers in combination with Social Security numbers of 1,547,169 individuals were affected.[9]

10.     Time is of the essence when highly sensitive PII is subject to unauthorized access and/or acquisition. It took more than six months for Defendant to publicly report this Data Breach. The compromised PII of Plaintiff and Class Members can be sold on the dark web. Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing millions of Social Security numbers.

11.     The Data Breach occurred due to Defendant's negligent and/or careless acts and omissions and the failure to protect the PII of Plaintiff and Class Members. It is unclear whether Defendant has yet provided notice of the Data Breach to all affected individuals,[10] and Defendant still maintains as secret the specific vulnerabilities and root causes of the Data Breach. Plaintiff and Class Members also remain unaware of precisely what information was accessed and subject to unauthorized activity and for how long. Nearly six months passed before Defendant "discovered" that Plaintiff's and Class Members' PII was accessed and/or acquired by unauthorized actors— allegedly on or before June 2, 2022—leaving Plaintiff and Class Members exposed, without knowledge or recourse, for the entirety of that time.

12.     This PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect PII of Plaintiff and Class Members for a second time in the span of one year.

---

[9] https://apps.web.maine.gov/online/aeviewer/ME/40/667f2112-b49f-445d-be03-dee38e32bf8e.shtml (last visited August 22, 2022).

[10] Defendant reported to the Texas Attorney General that that, as of June 20, 2022, Defendant still had not provided written notice to affected Texans, however, Defendant reported to the Office of the Maine Attorney General that it would be providing written notification to affected individuals on June 17, 2022. *See* https://oagtx.force.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited August 22, 2022); https://apps.web.maine.gov/online/aeviewer/ME/40/667f2112-b49f-445d-be03-dee38e32bf8e.shtml (last visited August 22, 2022).

13.     Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of its inadequate information security practices; and (iii) comply with industry standards to protect information systems that contain PII and, as a result, Defendant's systems containing customer PII experienced unauthorized access, disclosure, and exfiltration. Defendant's conduct amounts to negligence and violates federal and state statutes. Plaintiff seek, among other things, orders requiring Defendant to fully and accurately disclose the nature of the information that has been compromised and to fully and accurately disclose the circumstances under which that information was compromised, to adopt reasonably sufficient security practices and safeguards to prevent future unauthorized access, disclosure, and exfiltration, to destroy information no longer necessary to retain for purposes for which the information was first obtained from Class Members.

14.     Following the breach and recognizing that Plaintiff, along with each and every Class Member, are now subject to the present and continuing risk of identity theft and fraud, Defendant offered Plaintiff and Class Members credit monitoring and identity repair services for twenty-four months through Kroll. The offered services are insufficient to protect Plaintiff and Class Members from the lifelong implications of having their most private PII accessed, acquired, exfiltrated, and/or published onto the internet. As another element of damages, Plaintiff and Class Members seeks a sum of money sufficient to provide to Plaintiff and Class Members identity theft protective services for their respective lifetimes.

15.     Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and significantly (iv) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further

unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

16.     Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff's and Class Members' PII was safeguarded, failing to take available steps to prevent another unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As the result, the PII of Plaintiff and Class Members was compromised through disclosure to and/or acquisition by an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

17.     Plaintiff also brings this action individually against TransUnion for violations of the Fair Credit Reporting Act ("FCRA"). Following the Data Breach Plaintiff ordered a credit report from TransUnion to ascertain whether his PII had been improperly utilized by malfeasors. Upon receipt of that report, Plaintiff discovered that several fraudulent transactions had indeed been made using his PII, including a $31,081 loan from Lending Point LLC. Plaintiff informed TransUnion of this and disputed the items on the report. Rather than correct the information on Plaintiff's credit report, TransUnion informed him that it had investigated the items and verified them as accurate.

## II.   PARTIES

18.     Plaintiff Valeriano Saucedo is a natural person and citizen of the State of California.

19.     Defendant Flagstar Bank, FSB is a Michigan-based federally chartered stock savings bank, headquartered at 5151 Corporate Drive, Troy, Michigan.

20.     Defendant Trans Union, LLC, is a limited liability company formed under the laws of the State of Delaware and registered to do business in the State of California. TransUnion may be served with process via its registered agent, Prentice-Hall Corporation System, at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833. TransUnion is a consumer credit reporting agency. TransUnion collects and aggregates information on over one billion individual consumers in over

thirty countries. TransUnion also markets credit reports and other credit and fraud-protection products directly to consumers.[11]

21.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

22.     All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## III.     JURISDICTION AND VENUE

23.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one other Class Member is a citizen of a state different from Defendants to establish minimal diversity.

24.     The Northern District of California has personal jurisdiction over Defendants because Defendants conduct substantial business within the State of California.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to the Court's personal jurisdiction within this district.

## IV.     FACTUAL ALLEGATIONS

26.     Defendant used its internal systems to store and/or share some of Plaintiff's and Class Members most sensitive and confidential information, names, addresses, Social Security numbers, financial information (e.g. account numbers, credit or debit card numbers), and "other" types of personal identifiable information, which is static, does not change, and can be used to commit myriad financial crimes.

---

[11] https://en.wikipedia.org/wiki/TransUnion (last visited August 23, 2022).

27.     Plaintiff and Class Members relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their PII.

28.     Defendant had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII from involuntary disclosure to third parties.

### *The Data Breach*

29.     On or about June 17, 2022, Defendant reported the Data Breach to the Office of the California Attorney General. Defendant's report included a "Standard Notification Letter," that read, in part, as follows:

> Flagstar Bank treats the security and privacy of your personal information with the utmost importance, which is why we are writing to let you know about a recent security incident. We want to provide you with information about the incident, explain the services we are making available to you, and let you know that we continue to take significant measures to help protect your information.
>
> **What Happened?**
>
> Flagstar recently experienced a cyber incident that involved unauthorized access to our network. In response, Flagstar promptly took steps to secure its environment and investigate the incident with the assistance of third-party forensic experts.
>
> **What We Are Doing.**
>
> Upon learning of the incident, we promptly activated our incident response plan, engaged external cybersecurity professionals experienced in handling these types of incidents, and reported the matter to federal law enforcement. After an extensive forensic investigation and manual document review, we discovered on June 2, 2022 that certain impacted files containing your personal information were accessed and/or acquired from our network between December 3, 2021 and December 4, 2021. We have no evidence that any of the information has been

misused. Nevertheless, out of an abundance of caution, we want to make you aware of the incident.

**What Information Was Involved?**

On June 2, 2022, we determined that one or more of the impacted files contained your <><>.

**What You Can Do.**

We have no evidence that any of your information has been misused. Nevertheless, out of an abundance of caution we have secured the services of Kroll to provide identity monitoring at no cost to you for two years. Kroll is a global leader in risk mitigation and response, and their team has extensive experience helping people who have sustained an unintentional exposure of confidential data. Your identity monitoring services include Credit Monitoring, Fraud Consultation, and Identity Theft Restoration. Additional information describing your services is included with this letter.

This letter also provides other precautionary measures you can take to help protect your personal information, including placing a fraud alert and/or security freeze on your credit files, and/or obtaining a free credit report. Please review the attachment to this letter, entitled "Steps You Can Take to Help Protect Your Information," for further information. The attachment also includes the toll-free telephone numbers and addresses of the three major credit reporting agencies. Additionally, you should always remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity on a regular basis.[12]

30.     On or about June 17, 2022, Defendant notified other states Attorneys General of the Data Breach.[13]

---

[12] Rob Bonta, Attorney General of California, *Search Data Security Breaches*, (https://oag.ca.gov/privacy/databreach/list); *Submitted Breach Notification Sample*, (https://oag.ca.gov/ecrime/databreach/reports/sb24-554369) (last visited August 26, 2022); https://oag.ca.gov/system/files/Flagstar%20Bank%20Ad%20Standard%20r3prf.pdf (last visited August 22, 2022).

[13] https://oagtx.force.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited (footnote continued)

31.    Defendant notified the Office of the Maine Attorney General that the information of 1,547,169 individuals was accessed and/or acquired on or about December 3, 2021 through December 4, 2021, and that information included names and other personal identifiers in combination with Social Security numbers.[14]

32.    On or about June 20, 2022, Defendant notified the Attorney General of Texas that the affected types of PII included: name of individual; address; Social Security Number information; financial information (e.g. account number, credit or debit card number); and "other" types of information.[15]

33.    Defendant admitted in the Notice of Data Breach, the reports to the Attorneys General, and the "sample" notices of the Data Breach that an unauthorized party accessed and/or acquired one or more documents that contained sensitive information about Defendant's current and former customers, including names, addresses, Social Security numbers, financial information (e.g. account numbers, credit or debit card numbers), and "other" types of personal identifiable information.

34.    In response to the Data Breach, Defendant claims that it "promptly activated our incident response plan, engaged external cybersecurity professionals experienced in handling these types of incidents, and reported the matter to federal law enforcement."[16] However, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again have not been shared with regulators or Plaintiff and Class Members, who retain a vested interest in ensuring that their information remains protected. Learning of this information is especially important considering this was Defendant's second data breach in less than one year.

---

August 22, 2022); https://apps.web.maine.gov/online/aeviewer/ME/40/667f2112-b49f-445d-be03-dee38e32bf8e.shtml (last visited August 22, 2022).

[14] *Id.*

[15] https://oagtx.force.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited August 22, 2022)

[16] https://apps.web.maine.gov/online/aeviewer/ME/40/667f2112-b49f-445d-be03-dee38e32bf8e/b6547621-069e-419d-bdf1-9652e3e22c44/document.html (last visited August 22, 2022).

35.     Plaintiff's and Class Members' unencrypted information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

36.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiff and Class Members, causing their PII to be exposed.

### *Defendant Acquires, Collects, and Stores Plaintiff's and Class Members' PII*

37.     Defendant has a posted privacy policy ("Privacy Policy") on its website, at the bottom of its homepage, under a tab entitled "Security." The Privacy Policy was last revised in February of 2018. The Privacy Policy states "[f]inancial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do."[17]

38.     The types of personal information Defendant collects, and potentially shares, "depend[s] on the product or service" customers have with Defendant.[18]

39.     Defendant states it collects PII, among other types of information, including: "Social Security number and credit scores[;] Account transactions and checking account information[; and] Transaction history and payment history."[19]

40.     Defendant states that it continues to retain this PII and other sensitive information for former customers, and that it "continue[s] to share your information as described in this notice."[20]

---

[17] https://www.flagstar.com/content/dam/flagstar/pdfs/about-flagstar/PrivacyPolicy.pdf (last visited August 22, 2022).

[18] *Id.*

[19] *Id.*

[20] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

41. Defendant states that "All financial companies need to share customers' personal information to run their everyday business." Defendant then lists permissible purposes that it may share customers' information, none of which are applicable here.[21]

42. Defendant acquired, collected, and stored Plaintiff's and Class Members' PII.

43. As a condition of providing services to its customers, Defendant requires that its customers entrust Defendant with highly confidential PII.

44. By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

45. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***Securing PII and Preventing Breaches***

46. Defendant could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiff and Class Members. Alternatively, Defendant could have destroyed the data, especially decade-old data from former customers.

47. Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

48. Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is further exacerbated by the data breach it experienced in January of 2021.

49. Despite the Defendant's recent previous data breach and the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

---

[21] *Id.*

50.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[22] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

51.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### *Value of Personal Identifiable Information*

52.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[23] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[24] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[25]

53.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an

---

[22] 17 C.F.R. § 248.201 (2013).

[23] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited August 22, 2022).

[24] *Here's How Much Your Personal Information is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited August 22, 2022).

[25] *In the Dark, VPNOverview*, 2019, *available at* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited August 22, 2022).

individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[26]

54.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

55.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[27]

56.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change— name, Social Security number, and potentially date of birth.

---

[26] Social Security Administration, *Identity Theft and Your Social Security Number, available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited August 22, 2022).

[27] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited August 22, 2022).

57.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[28]

58.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

59.    The PII of Plaintiff and Class Members was taken by hackers to engage in identity theft or and or to sell it to other criminals who will purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

60.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[29]

61.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if the PII was compromised, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members a result.

---

[28] Time Greene, *Anthem Hack: Personal Data Solen Sells for 10x Price of Stolen Credit Card Numbers*, IT World (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited August 22, 2022).

[29] *Report to Congressional Requesters*, GAO at 29 (June 2007), *available at*: https://www.gao.gov/products/gao-07-737 (last visited August 22, 2022).

62.     Plaintiff and Class Members are each now subject to the present and continuing risk of identity theft and fraud and now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

63.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's file servers, amounting to more than one and half million individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

64.     Following the breach and recognizing that Plaintiff, along with each and every Class Member, is now subject to the present and continuing risk of identity theft and fraud, Defendant offered Plaintiff and Class Members twenty- four months of identity monitoring services through a single provider, Kroll. The offered service is inadequate to protect Plaintiff and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

65.     Moreover, Defendant put the burden squarely on Plaintiff and Class Members to enroll in the inadequate monitoring services, among other steps Plaintiff and Class Members must take to protect themselves. Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.5% of U.S.-based workers are compensated on an hourly basis, while the other 44.5% are salaried.[30]

66.     According to the U.S. Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per week;[31] leisure time

---

[30] U.S. Bureau of Labor Statistics, Wage Worker Survey, *available at* https://www.bls.gov/opub/reports/minimum-wage/2020/home.htm#:~:text=In%202020%2C%2073.3%20million%20workers,wage%20of%2%200%247.25%20per%20hour (last visited August 22, 2022); *see also* U.S. Bureau of Labor Statistics, *Average Weekly Wage Data, available at* https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=1&year=2021&qtr=3&own=5&ind=10&supp=0 (last visited August 22, 2022) (finding that on average, private-sector workers make $1,253 per 40-hour work week.)

[31] *See* James Wallman, *How Successful People Spend Leisure Time*, CNBC (Nov. 6, 2019), *available at* https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html (last visited August 22, 2022).

is defined as time not occupied with work or chores and is "the time equivalent of 'disposable income.'"[32] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves. Defendant states its affected current and former customers to "should always *remain* vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity *on a regular basis*."[33]

67.     Plaintiff and Class Members are now deprived of the choice as to how to spend their valuable free hours and seeks renumeration for the loss of valuable time as another element of damages.

68.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### Defendant Violated the Gramm-Leach-Bliley Act

69.     Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

70.     The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

71.     Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendant was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1 et seq., and is subject to numerous rules and regulations promulgated on the GLBA statutes.

---

[32] *Id*.

[33] https://apps.web.maine.gov/online/aeviewer/ME/40/667f2112-b49f-445d-be03-dee38e32bf8e/b6547621-069e-419d-bdf1-9652e3e22c44/document.html (last visited August 22, 2022) (emphasis added).

72.     The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

73.     Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

74.     Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

75.     Defendant failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing that PII on Defendant's network systems.

76.     Defendant failed to adequately inform its customers that it was storing and/or sharing, or would store and/or share, the customers' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the customer relationship ended.

77.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4. As alleged herein, Defendant violated the Safeguard Rule.

78.     Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information.

79.     Defendant failed to adequately evaluate and adjust its information security program in light of the previous data breach, changes to its business operation, and other relevant circumstances, including the heightened cyber-attack risk environment.

80.     Further, Defendant stated that, though the Data Breach began in or around December 3, 2021, it did not "discover" the information had been accessed and/or acquired by an unauthorized third-party until June 2, 2022.

81.     As of January 4, 2019, Defendant's "Policies and Procedures" for "Compliance" recognized that the GLBA "prohibits financial institutions from sharing the non-public personal information of consumers with non-affiliated third parties except in certain circumstances."

82.     As of January 4, 2019, Defendant further recognized the GLBA required it to (a) "[p]rovide an opt-out notice prior to sharing non-public personal information with non-affiliated third

parties" and (b) "[p]rovide customers with a 'reasonable opportunity' to opt out before disclosing non-public personal information about them to non-affiliated third parties."

83.    As of January 4, 2019, Defendant admitted that it had not provided Plaintiff or Class Members an opt-opt notice, stating it "does not currently share non-public personal information with non-affiliated third parties; therefore, it is not required to and does not provide an opt-out notice."

84.    Defendant violated the GLBA and its own policies and procedures by sharing the PII of Plaintiff and Class Members with a non-affiliated third party without providing Plaintiff and Class Members (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

85.    Defendant has not informed Plaintiff and Class Members of the reason Defendant kept the PII of more than 1.5 million individuals on an unsecured platform, accessible from the internet, especially considering its recent breach reported in March of 2021; if this was done to share the PII with yet another non- affiliated third party, Defendant would be further in breach of the GLBA and its own policy and procedures in failing to provide Plaintiff and Class Members an opt-out notice and a reasonable opportunity to opt out of such disclosure.

### Plaintiff Valeriano Saucedo's Experience

86.    In or about 2016, Plaintiff utilized Defendant as a mortgage lender in connection with a home mortgage refinancing. Defendant acted as Plaintiff's mortgage lender from November of 2016 to November of 2020. Upon information and belief, Defendant continued to store Plaintiff's personal financial information following this period, until the Data Breach in or about December of 2021.

87.    Plaintiff did not receive notice of the Data Breach from Defendant until on or about June 17, 2022. In response, Plaintiff accessed a credit report from TransUnion in or about July, 2022. According to that report, by July 1, 2022, unknown perpetrators used Plaintiff's personal financial information to (1) successfully apply for two US Bank Gold Checking Accounts, (2) obtain a $31,081 unsecured loan from Lending Point LLC, and (3) make a credit inquiry through the online bank WEBBANKAVANT LLC. Further, the perpetrators have listed a former Salinas, California address as Plaintiff's current address, and they have listed telephone numbers that are unknown to Plaintiff as Plaintiff's personal phone numbers. Further, Plaintiff filed a police report regarding the foregoing fraudulent conduct.

88.     Plaintiff informed TransUnion that the above-referenced items were fraudulent as a result of the Data Breach, and opened a dispute. On or about August 5, 2022, TransUnion sent Plaintiff a letter informing him of the results of its investigation. That letter stated, in relevant part, that the disputed items were verified as accurate. The letter further stated Plaintiff would need to take further steps to resolve the dispute.

89.     As set forth above, Plaintiff has spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, exploring further credit monitoring and identify theft insurance options, and self-monitoring his financial accounts. This time has been lost forever and cannot be recaptured.

90.     Additionally, Plaintiff is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

91.     Plaintiff stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

92.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

93.     Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

94.     Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name and Social Security number being placed in the hands of unauthorized third-parties and possibly criminals.

95.     Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## V.    CLASS ALLEGATIONS

96.    Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

97.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

All individuals residing in the United States whose personally identifiable information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Flagstar Bank on or about June 17, 2022 (the "Nationwide Class").

98.    The California Class that Plaintiff seeks to represent is defined as follows:

All individuals residing in the State of California whose personally identifiable information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Flagstar Bank on or about June 17, 2022 (the "California Class").

99.    Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff.

100.    Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

101.    <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Nationwide Class (the "Class") is so numerous that joinder of all members is impracticable. Defendant reported to the Attorney General of Maine that more than 1.5 million individuals were affected by the Data Breach.

102.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.  Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

b.  Whether Defendant had a duty not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c.  Whether Defendant had a duty not to use the PII of Plaintiff and Class Members for non-business purposes;

d.  Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

e.  Whether and when Defendant actually learned of the Data Breach;

f.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

k.  Whether Plaintiff and Class Members are entitled to actual, damages, and/or statutory damages as a result of Defendant's wrongful conduct;

l.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

m.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

103.     <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

104.     Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members,  and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

105.     Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

106.     <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

107.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the claim for relief alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

108.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

109.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

110.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to act unlawfully as set forth in this Complaint.

111.    Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

112.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e. Whether Defendant breached the implied contract;

f. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members; and,

i. Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## FIRST CLAIM FOR RELIEF
**Violation of the California Consumer Privacy Act, Civ. Code § 1798.150, *et seq*.**
**(On Behalf of Plaintiff and the California Class Against Defendant Flagstar)**

113. Plaintiff incorporates by reference the allegations contained in each and every paragraph of this Complaint.

114. Plaintiff brings this claim for relief on behalf of himself and on behalf of the California Class.

115. The California Consumer Privacy Act ("CCPA"), portions of which were operative beginning January 1, 2020, was enacted by the California Legislature "to further the constitutional right of privacy and to supplement existing laws relating to consumers' personal information, including, but not limited to, Chapter 22 (commencing with Section 22575) of Division 8 of the Business and Professions Code and Title 1.81 (commencing with Section 1798.80)." Cal. Civ. Code

§ 1798.100. The CCPA applies to "the collection and sale of all personal information collected by a business from consumers." *Id*.

116.     "Businesses," defined to include a "corporation" that "collects consumers' personal information" that "does business in the State of California" and has annual gross revenues in excess of $25 million, are required to comply with the CCPA. Cal. Civ. Code § 1798.140(c). Defendant is a "business" under the CCPA.

117.     The CCPA protects "consumers." "Consumer" is defined as "a natural person who is a California resident[.]" Cal. Civ. Code § 1798.140(g). Plaintiff and members of the California Class are "consumers" within the meaning of the CCPA.

118.     The protections of the CCPA extend to "personal information" of consumers. "Personal information" is defined by the CCPA to include "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(o)(1). "Personal information includes, but is not limited to, the following if it identifies, relates to, describes, is reasonably capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular consumer or household: (A) Identifiers such as... driver's license number, ...." Cal. Civ. Code § 1798.140(o)(1)(A). The PII of Plaintiff and members of the California Class that was compromised in Defendant's data breach included "personal information" within the meaning of the CCPA.

119.     The CCPA provides consumers with the right to institute a civil action where the consumers' "nonencrypted and nonredacted personal information" was the subject of "an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information." Cal. Civ. Code § 1798.150(a)(1).

120.     Plaintiff and California Class members provided to Defendant their nonencrypted and nonredacted personal information as defined in § 1798.81.5 in the form of their PII.

121.   Defendant, as a "business" covered by the CCPA, owed a duty to Plaintiff and members of the California Class to implement and maintain reasonable security procedures and practices to protect the PII of Plaintiff and members of the California Class.

122.   Defendant breached this duty. In or about June, 2022, Defendant notified government officials in, without limitation, Maine and Texas, that its customers' PII was subject to a data security breach between in December, 2021.

123.   The fact that Plaintiff and the California Class's PII was accessed without authorization establishes that Defendant did not take adequate data security measures to store and protect its customers' PII. Defendant failed to take adequate security measures to protect Plaintiff and the California Class members' PII.

124.   As a direct and proximate result of Defendant's acts and omissions, Plaintiff and the members of the California Class were subjected to unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's violation of the duty.

125.   On behalf of the California Class, Plaintiff seeks injunctive relief in the form of an order (a) enjoining Defendant from continuing to violate the CCPA; and (b) requiring Defendant to employ adequate security practices consistent with law and industry standards to protect class members' PII.

126.   Plaintiff and California Class members are at high risk of suffering, or have already suffered, injuries that cannot be remedied monetarily, such as reductions to their credit scores and identity theft. As such, the remedies at law available to Plaintiff and California Class members are wholly inadequate by themselves.

127.   The full extent of the existing and potential harm caused by Defendant's failure to protect its customers' PII cannot be remedied by monetary damages alone because monetary compensation does nothing to prevent the reoccurrence of another data breach in the future.

128.   Plaintiff presently seeks only injunctive relief and any other relief the court deems proper pursuant to this section, such as attorneys' fees. Plaintiff will serve written notice identifying Defendant's violation of Civ. Code § 1798.150(a) demanding that the Data Breach be cured, and will

amend this Complaint to seek statutory damages pursuant to Civ. Code § 1798.150(a)(1)(A) if Defendant does not timely cure the Data Breach.

## SECOND CLAIM FOR RELIEF
### Violation of the California Business & Professions Code § 17200, *et seq.*
### (On Behalf of Plaintiff and the California Class Against Defendant Flagstar)

129.     Plaintiff incorporates by reference the allegations contained in each and every paragraph of this Complaint.

130.     Plaintiff brings this claim for relief on behalf of himself and on behalf of the California Class.

131.     California Business and Professions Code section 17200, *et seq*., also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

### The Unlawful Prong of the UCL

132.     A claim for relief may be brought under the "unlawful" prong of the UCL if a practice violates another law. Such an action borrows violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under the UCL.

133.     Here, Defendant's "unlawful" acts and practices include violating California Civil Code section 1798.150 as described above, and failing to implement and maintain reasonable security measures contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45 and California's Consumer Records Act, Cal. Civ. Code § 1798.81.5 pertaining to "security procedures and practices with respect to personal information about California residents."

### The Unfair Prong of the UCL

134.     A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and

that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

135.  Here, Defendant's unfair acts and practices include:

a.  failing to abide by the provisions of California Civil Code section 1798.150

b.  failing to implement and maintain reasonable security measures contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45 and California's Consumer Records Act, Cal. Civ. Code § 1798.81.5

c.  failing to implement and maintain reasonable security measures to protect Plaintiff and the California Class's PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the data breach. Defendant failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security despite knowing the risk of cybersecurity incidents. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiff and the California Class, whose PII has been compromised; and

d.  failing to implement and maintain reasonable security measures, which also led to substantial consumer injuries, as described above, and which are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Defendant's inadequate security, consumers could not have reasonably avoided the harms that Defendant caused.

***The Fraud Prong of the UCL***

136.  A business act or practice is "fraudulent" within the meaning of the UCL if members of the public are likely to be deceived.

137.  Here, Defendant's fraudulent acts and practices include:

a.  misrepresenting that it would protect the privacy and confidentiality of Plaintiff and the California Class's PII, including by implementing and maintaining reasonable security measures; and

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

b.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and the California Class's PII.

138.   Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' PII.

139.   As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff and members of the California Class were injured and lost money or property, including, but not limited to: the money received by Defendant for its services; the loss of the benefit of their bargain with and overcharges by Defendant as they would not have paid Defendant for services or would have paid less for such services but for the violations alleged herein; losses from fraud and identity theft; any costs they will have to incur for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

140.   Plaintiff and the California Class seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their PII; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure section 1021.5; injunctive relief; and other appropriate equitable relief.

**THIRD CLAIM FOR RELIEF**
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class Against Defendant Flagstar)**

141.   Plaintiff incorporates by reference the allegations contained in each and every paragraph of this Complaint.

142.   Defendant required Plaintiff and the Class to submit sensitive PII in order to purchase financial products. Defendant stored this sensitive and valuable PII on its computer and data storage systems.

143.   By collecting, storing, using, and profiting from this data, Defendant had a duty of care to Plaintiff and the Class to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting this PII in Defendant's possession from being compromised,

lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems and data storage architecture to ensure that Plaintiff and the Class's PII was adequately secured and protected; (b) implementing processes that would detect an unauthorized breach of Defendant's security systems and data storage architecture in a timely manner; (c) timely acting on all warnings and alerts, including public information, regarding Defendant's security vulnerabilities and potential compromise of the compiled data of Plaintiff and the Class; (d) maintaining and implementing data security measures consistent with industry standards; and (e) instituting data security policies and procedures, and adequately training employees and franchisees on such policies and procedures.

144.    Defendant had common law duties to prevent foreseeable harm to Plaintiff and the Class. These duties existed because Plaintiff and members of the Class were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiff and the Class would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, Defendant knew that it was more likely than not that Plaintiff and other class members would be harmed by such theft.

145.    Defendant had a duty to monitor, supervise, control, or otherwise provide oversight to safeguard the PII that was collected and stored on its computer systems.

146.    Defendant's duties to use reasonable security measures also arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff and members of the Class, on the other hand. The special relationship arose because Plaintiff and members of the Class entrusted Defendant with their PII in order to purchase financial products. Defendant alone could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the data breach.

147.    Defendant knew or should have known that its computer systems and data storage architecture were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing confidential PII.

148.    Defendant breached the duties it owed to Plaintiff and Class members described above and thus was negligent. Defendant breached these duties by, among other things, failing to: (a)

exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiff and the Class; (b) detect the breach while it was ongoing; (c) maintain security systems consistent with industry standards; and (d) institute data security policies and procedures, and adequately train employees and franchisees on such policies and procedures.

149.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and the Class members, their PII would not have been compromised.

150.     As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the data breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non- economic harm.

## FOURTH CLAIM FOR RELIEF
### Breach of Contract
### (On Behalf of Plaintiff and the Nationwide Class Against Defendant Flagstar)

151.     Plaintiff incorporates by reference the allegations contained in each and every paragraph of this Complaint.

152.     At all relevant times, Defendant and Plaintiff and the Class mutually assented to and therefore were bound by the version of Defendant's Privacy/Security Policy (the "Contract") that was operative at the time Plaintiff and each of the Class members purchased products from Defendant.

153.     Defendant's Privacy Policy forms a binding contract between Defendant and Plaintiff and the Class.

154.    Throughout the Class Period, Defendant affirmatively stated in the Contract that it would utilize sufficient data security protocols and mechanisms to protect its customers' data from unauthorized access.

155.    Specifically, Defendant represented that "To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[34]

156.    Defendant breached the Contract by failing to have proper safeguards to protect Plaintiff and the Class members' PII and allowing a malicious third party to access that information without permission. Defendant violated its commitment to maintain the confidentiality and security of the PII of Plaintiff and the Class and failed to comply with its own polices and industry standards related to data security.

## FIFTH CLAIM FOR RELIEF
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Nationwide Class Against Defendant Flagstar)**

157.    Plaintiff incorporates by reference the allegations contained in each and every paragraph of this Complaint.

158.    Plaintiff and the Class members entered contracts with Defendant which included the implied terms that Defendant would not expose the PII to hackers and that Defendant would take reasonable measures to protect the PII.

159.    In these contracts, as in every contract, there was an implied covenant of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another, that is, being faithful to one's duty or obligation.

---

[34] https://www.flagstar.com/content/dam/flagstar/pdfs/about-flagstar/PrivacyPolicy.pdf (last visited August 22, 2022).

160.     Plaintiff and the Class members performed everything that they were required to do under the contract by supplying their PII and paying for the products in question. All conditions for Defendant's performance have occurred or were excused.

161.     Defendant failed to protect the PII from exposure to hackers and failed to adopt reasonable measures to protect the PII, operating a website with numerous security flaws as shown above.

162.     By doing so, Defendant did not act fairly and in good faith. Good faith and fairness required Defendant to protect the PII from hackers, including by adopting reasonable measures. Consumers must count on companies who collect their PII to protect that PII in order to facilitate commercial transactions, which increasingly occur over the internet.

163.     As a result of this conduct, Plaintiff and the Class members were damaged. Plaintiff and the Class members' PII is being sold by nefarious individuals on the dark web. As a result, Plaintiff and the Class members have been forced to incur out of pocket costs for credit monitoring, and to take time and effort to cancel credit cards and/or freeze accounts. Plaintiff and the Class members have also lost the benefit of their bargain. Plaintiff and the Class members agreed to purchase goods and provide their PII to Defendant with the understanding that their PII would be protected. Had Plaintiff and the Class members known that their PII would not be protected, they would not have agreed to pay the price which they contracted for in exchange for the goods. Plaintiff and the Class members also face a significant risk that their PII will be stolen, that they will lose money, and that their identities will be stolen as a result of the breach. That risk only increases as time passes and no action is taken. Finally, Plaintiff and the Class members have lost the value of their PII, which has a real market value.

164.     Plaintiff has suffered monetary injury in fact as a direct and proximate result of the acts committed by Defendant, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

165.     Defendant and Plaintiff and the Class members entered an implied contract governing the use and protection of PII when Plaintiff and the Class members supplied their PII in order to purchase goods from Defendant. Plaintiff and the Class members performed everything that they

were required to do under the contract by supplying their PII and paying for the goods in question. All conditions required for Defendant's performance have occurred or were excused.

166.   This contract was manifested in the conduct of the parties. By agreeing to take Plaintiff and the Class members' PII into its possession, Defendant impliedly agreed to protect that PII from hackers, who were known to attempt to steal PII by hacking entities which possess it, to adopt reasonable measures to protect the PII from hackers, and to timely notify Plaintiff and the Class members of a data breach should one occur. Defendant knew, or had reason to know, that by taking the PII, it was engaging in conduct that would lead Plaintiff and the Class members to believe that it would protect that data from exposure to hackers, due to the known risk of hacking, which was understood by both parties to the contract. Other conduct which gives rise to this contractual agreement is Defendant's adoption of passwords through which Plaintiff and the Class members ostensibly kept their information private, and the posting of a Privacy/Security Policy on Defendant's website.

167.   Defendant breached these promises. As shown, Defendant allowed hackers to obtain its customers' PII. Defendant failed to adopt reasonable security measures to protect its customers' data.

168.   As a result of these breaches, Plaintiff and the Class members were damaged. Plaintiff and the Class members' PII is being sold by nefarious individuals on the dark web. As a result, Plaintiff and the Class members have been forced to incur out of pocket costs for credit monitoring, and to take time and effort to cancel credit cards and/or freeze accounts. Plaintiff and the Class members have also lost the benefit of their bargain. Plaintiff and the Class members agreed to purchase goods and provide their PII to Defendant with the understanding that their PII would be protected. Had Plaintiff and the Class members known that their PII would not be protected, they would not have agreed to pay the price which they contracted for in exchange for the goods. Plaintiff and the Class members also face a significant risk that their PII will be stolen, that they will lose money, and that their identities will be stolen as a result of the breach. That risk only increases as time passes and no action is taken. Finally, Plaintiff and the Class members have lost the value of their PII, which has a real market value.

169.    Plaintiff's and the Class members' losses were caused by Defendant's breach. By allowing the hackers to obtain the PII, Defendant caused Plaintiff and the Class members to incur out-of-pocket expenses, lose the benefit of their bargain, incur the risk of identity and property theft, and lose the value of their PII. Plaintiff has suffered monetary injury in fact as a direct and proximate result of the acts committed by Defendant, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

## SIXTH CLAIM FOR RELIEF
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Nationwide Class Against Defendant Flagstar)

170.    Plaintiff incorporates by reference the allegations contained in each and every paragraph of this Complaint.

171.    Plaintiff and the Class also entered into an implied contract with Defendant when they obtained services from Defendant, or otherwise provided PII to Defendant.

172.    As part of these transactions, Defendant agreed to safeguard and protect the PII of Plaintiff and the Class members.

173.    Plaintiff and Class members entered into implied contracts with the reasonable expectation that Defendant data security practices and policies were reasonable and consistent with industry standards. Plaintiff and the Class members believed that Defendant would use part of the monies paid to Defendant under the implied contracts to fund adequate and reasonable data security practices.

174.    Plaintiff and the Class would not have provided and entrusted their PII to Defendant or would have paid less for Defendant's services in the absence of the implied contract or implied terms between them and Defendant. The safeguarding of the PII of Plaintiff and Class members was critical to realize the intent of the parties.

175.    Plaintiff and the Class members fully performed their obligations under the implied contracts with Defendant.

176.    Defendant breached its implied contracts with Plaintiff and the Class members to protect their PII when it failed to have security protocols and measures in place to protect that information which resulted in a data breach.

177.    As a direct and proximate result of these breaches of implied contract, Plaintiff and the Class members sustained actual losses and damages as described in detail above including, but not limited to, that they did not get the benefit of the bargain pursuant to which they provided their PII to Defendant.

178.    As a result of these breaches, Plaintiff and the Class members were damaged. Plaintiff and the Class members' PII is being sold by nefarious individuals on the dark web. As a result, Plaintiff and the Class members have been forced to incur out of pocket costs for credit monitoring, and to take time and effort to cancel credit cards and/or freeze accounts. Plaintiff and the Class members have also lost the benefit of their bargain. Plaintiff and the Class members agreed to purchase goods and provide their PII to Defendant with the understanding that their PII would be protected. Had Plaintiff and the Class members known that their PII would not be protected, they would not have agreed to pay the price which they contracted for in exchange for the goods. Plaintiff and the Class members also face a significant risk that their PII will be stolen, that they will lose money, and that their identities will be stolen as a result of the breach. That risk only increases as time passes and no action is taken. Finally, Plaintiff and the Class members have lost the value of their PII, which has a real market value.

**SEVENTH CLAIM FOR RELIEF CLAIM FOR RELIEF**
**Breach of Confidence**
**(On Behalf of Plaintiff and the Nationwide Class Against Defendant Flagstar)**

179.    Plaintiff incorporates by reference the allegations contained in each and every paragraph of this Complaint.

180.    Plaintiff and Class members conveyed confidential and novel information to Defendant.

181.    Defendant had knowledge that the information was being disclosed in confidence.

182.    There was an understanding between Defendant and the Plaintiff and Class members that the confidence would be maintained.

183.    There was a data breach/disclosure in violation of the understanding.

184.    As a result of these breaches, Plaintiff and the Class members were damaged. Plaintiff and the Class members' PII is being sold by nefarious individuals on the dark web. As a result, Plaintiff and the Class members have been forced to incur out of pocket costs for credit monitoring, and to take time and effort to cancel credit cards and/or freeze accounts. Plaintiff and the Class members have also lost the benefit of their bargain. Plaintiff and the Class members agreed to purchase goods and provide their PII to Defendant with the understanding that their PII would be protected. Had Plaintiff and the Class members known that their PII would not be protected, they would not have agreed to pay the price which they contracted for in exchange for the goods. Plaintiff and the Class members also face a significant risk that their PII will be stolen, that they will lose money, and that their identities will be stolen as a result of the breach. That risk only increases as time passes and no action is taken. Finally, Plaintiff and the Class members have lost the value of their PII, which has a real market value.

**EIGHTH CLAIM FOR RELIEF CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Nationwide Class Against Defendant Flagstar)**

185.    Plaintiff incorporates by reference the allegations contained in each and every paragraph of this Complaint.

186.    Plaintiff and Class members gave Defendant their PII in confidence, believing that Defendant would protect that information. Plaintiff and Class members would not have provided Defendant with this information had they known it would not be adequately protected. Defendant's acceptance and storage of Plaintiff and Class members' PII created a fiduciary relationship between Defendant and Plaintiff and Class members. In light of this relationship, Defendant must act primarily for the benefit of its customers, which includes safeguarding and protecting Plaintiff and Class Members' PII.

187.     Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and Class members' PII, failing to comply with data security guidelines, and otherwise failing to safeguard Plaintiff's and Class members' PII that it collected.

188.     As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of- pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

### NINTH CLAIM FOR RELIEF CLAIM FOR RELIEF
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class Against Defendant Flagstar)**

189.     Plaintiff incorporates by reference the allegations contained in each and every paragraph of this Complaint.

190.     This claim is pleaded in the alternative to the breach of express and implied contract claims.

191.     Plaintiff and Class members conferred a monetary benefit upon Defendant in the form of monies paid for services which were not provided in full.

192.     Defendant accepted and had knowledge of the benefits conferred upon it by Plaintiff and Class members. Defendant benefitted from the receipt of Plaintiff and Class members' PII, as this was used to facilitate payment.

193.     As a result of Defendant's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable

data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

194.    Defendant should not be permitted to retain the money belonging to Plaintiff and Class members because Defendant failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

195.    Defendant should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of its conduct relating to the Data Breach alleged herein.

**TENTH CLAIM FOR RELIEF CLAIM FOR RELIEF**
**Violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.***
**(On Behalf of Plaintiff Individually against TransUnion)**

196.    Plaintiff incorporates by reference the allegations contained in each and every paragraph of this Complaint.

197.    Pursuant to 15 U.S.C. 1681e(b), TransUnion is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports about Plaintiff.

198.    Pursuant to 15 U.S.C. § 1681i(a)(1)(A), TransUnion had an affirmative duty to independently investigate the dispute submitted by Plaintiff.

199.    Pursuant to 15 U.S.C. § 1681i(a)(2), TransUnion was required to communicate the specifics of Plaintiff's dispute to Lending Point LLC, including the forwarding of any documents provided by Plaintiff in support of that dispute.

200.    A consumer credit reporting agency's reasonable investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute, and may not merely be a pro forma record review that simply begs the question. A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

201.    The reasonableness of a investigation under the FCRA is generally a question of fact for the jury.

202.    In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), TransUnion was required to review and consider all relevant information submitted by Plaintiff.

203.    Plaintiff's dispute was clear and unambiguous as to the inaccuracies of TransUnion's reporting of the Lending Point LLC loan. Plaintiff provided all the relevant information necessary for TransUnion to conduct a reasonable investigation, and correct the inaccuracies in its reporting.

204.    TransUnion breached its duties as described herein.

205.    If TransUnion had conducted a reasonable investigation of Plaintiff's dispute, it would have reviewed and considered all of the information Plaintiff submitted in his dispute, and would have easily detected that what was being reported regarding the Lending Point LLC was factually incorrect, inaccurate, and misleading, and Plaintiff's TransUnion consumer report would have been appropriately corrected.

206.    Due to TransUnion's failures to follow reasonable procedures to assure maximum possible accuracy of information, and failures to conduct a reasonable reinvestigation of Plaintiff's dispute, the false and misleading information in Plaintiff's TransUnion report was not appropriately modified.

207.    The fact that TransUnion had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that TransUnion recklessly disregarded Plaintiff's dispute and the requirements of the FCRA, amounting to a willful violation of the statute. In the alternative, TransUnion's violation was negligent.

208.    As a result of TransUnion's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Plaintiff has suffered actual damages as described herein. Plaintiff is, therefore, entitled to recover actual damages from TransUnion pursuant to 15 U.S.C. §§ 1681n and 1681o.

209.    TransUnion's actions and omissions were willful, rendering TransUnion liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

210.    Plaintiff is entitled to recover costs and attorneys' fees from TransUnion pursuant to 15 U.S.C. §§ 1681n and 1681o.

## VI.    RELIEF REQUESTED

1.    Plaintiff, on behalf of himself, and all others similarly situated, requests the Court enter judgment against Defendant as follows:

a.    That the Court enter an Order certifying the proposed Nationwide and California Classes, finding Plaintiff an adequate representative and appointing him as Class Representative and the undersigned counsel as Class Counsel;

b.    That the Court enter an Order enjoining Defendant from further unfair and deceptive business practices regarding the maintenance and protection of Defendant's customer's PII;

c.    That the Court make an award to Plaintiff and the Nationwide and California Classes for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

d.    That the Court award restitution;

e.    The the Court declare, adjudge, and decree that Defendant must make full restitution to Plaintiff and Class members;

f.    That the Court award attorneys' fees and costs, as allowed by law including, without limitation, to California Code of Civil Procedure section 1021.5;

g.    The the Court award pre-judgment and post-judgment interest, as provided by law;

h.    That the Court award actual and punitive damages in favor of Plaintiff against TransUnion; and

i.    That the Court award such other relief as may be just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of any and all issues in this action triable of right by jury.

Dated:  August 26, 2022                          **MALLISON & MARTINEZ**

By:_____

Stan Mallison
Hector Martinez
Dan Keller
Attorneys for Representative Plaintiff
and the Plaintiff Class

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL